UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH CELLULAR TELEPHONE NUMBER 207-240-9812 THAT IS STORED AT PREMISES CONTROLLED BY VERIZON WIRELESS | No. 2:23-mj-291-KFW |

### AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT APPLICATION

I, Michael Gagnon, being duly sworn, depose and state as follows:

### INTRODUCTION

1.     I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice, with federal law enforcement jurisdiction, and have been in this position since January 2012. I joined the DEA Portland, Maine, Resident Office in 2018. I was assigned to the Los Angeles Division from 2012 until I moved to Portland. Prior to attaining sworn status as a Special Agent, I was employed by DEA and received specialized training in narcotics trafficking investigations and related legal matters at the DEA Training Academy in Quantico, Virginia. Before joining DEA, I was employed by the Newton Police Department in Newton, New Hampshire, from June 2009 to January 2012. During my employment with the Newton Police Department, I was a certified Peace Officer in the State of New Hampshire. I have received law enforcement training through the Police Standards and Training Counsel.

2.     In the course of my employment with DEA, I have received approximately 17 weeks of training at the DEA Academy in Quantico, Virginia about techniques used by major narcotics traffickers. I have specialized training involving the use, possession,

EXHIBIT 2

packaging, manufacturing, sales, concealment, and transportation of various controlled substances, money laundering techniques, and conspiracy investigations.

3. During my employment with DEA, I have participated in narcotics investigations both as a case agent and in a supportive role. I have participated in the arrests of multiple drug traffickers and in interviewing informants and suspects concerning the methods and means of drug traffickers. I have also participated in countless static and mobile surveillance activities and assisted in the execution of multiple search warrants and arrest warrants. I have conducted investigations regarding these unlawful activities, violations of Sections 841(a)(1), 843(b), 846, 952(a), and 963 of Title 21 of the United States Code, and Sections 2, 1952, 1956, and 1957 of Title 18 of the United States Code. As a DEA agent, I primarily investigate large-scale narcotics traffickers and money laundering organizations.

4. Based on my training and experience as a DEA Special Agent and police officer, I have become familiar with the criminal activities of individuals involved in drug trafficking organizations, including drug manufacture and distribution, money laundering, and unlawful use/possession of firearms.

5. The facts in this affidavit come from observations and information obtained from other DEA agents, police officers, and witnesses.

6. Based on my training, experience, participation in the investigation described below, and the facts set forth in this affidavit, I submit there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) (distribution of controlled substances), 21 U.S.C. §§ 843(b) (unlawful use of a communication facility), and 18 U.S.C. § 1959 (violent crimes in aid of racketeering) (the "TARGET OFFENSES") have been committed

and that evidence, fruits, and/or instrumentalities of such are likely to be found in the location to be searched.

7.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States…that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## LOCATION TO BE SEARCHED

8.  I make this affidavit in support of an application for a search warrant for information associated with cellular telephone number 207-240-9812 ("Target Telephone 2") that is stored at premises owned, maintained, controlled, or operated by Verizon Wireless, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921.

9.  The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Verizon Wireless. to disclose to the government records and other information, including the contents of communications, in its possession pertaining to the subscriber or customer associated with Target Telephone 2.

## BACKGROUND OF THE INVESTIGATION AND SHOWING OF PROBABLE CAUSE

10. DEA and other law enforcement agencies are currently investigating Lloyd Lyttle, Marcus Matthes, Nathaniel Ashwood, and others for drug trafficking and the commission of violent crimes in aid of racketeering. Below are descriptions of multiple

criminal acts that I believe support probable cause to obtain the requested information for Target Telephone 2.

### Recorded Call Placed to Lloyd Lyttle on July 11, 2023

11. In July 2023, a confidential source (CS-2)[1] working with DEA provided information about Lloyd Lyttle's involvement in drug trafficking. CS-2 indicated that he/she was familiar with Lyttle and had personal knowledge about his involvement in trafficking narcotics. CS-2 identified telephone number (207) 240-9812 ("Target Telephone 2" or "TT2") as a phone number Lyttle uses in furtherance of his drug trafficking activities.

12. On July 11, 2023, CS-2 placed a recorded phone call to TT2 at the direction of law enforcement officers. During this call, the following exchange occurred:

CS-2: You back around?

Lyttle: Not right now

CS-2: No? Are you coming back today?

Lyttle: Yeah. Should be.

CS-2: Okay. Alright. You all good? You okay?

Lyttle: Yeah

CS-2: Okay. Alright. Just wanted to see you to get something.

Lyttle: Alright. I'll call you when I'm back

CS-2: Ok. Sounds like a plan.

---

[1] CS-2 has a history of cooperating with a local police department. He/she has no pending federal charges but is facing state felony drug charges. CS-2 has a significant criminal history to include convictions for theft for unauthorized taking or transfer, forgery, unlawful possession of scheduled drugs, and violating conditions of release. No promises have been made to CS-2.

13. I believe this call is drug related. Specifically, I believe the following:

a. CS-2 contacted Lyttle for the purpose of purchasing narcotics;

b. CS-2 asked Lyttle if he was available;

c. Lyttle stated he was not available but should be returning that same day;

d. CS-2 told Lyttle he/she wanted to purchase narcotics from him;

e. Lyttle responded in the affirmative and said he would call when he returned.

14. No controlled narcotics transaction ultimately occurred on July 11, 2023.[2]

**Act of Violence at 34 South Street, Biddeford, Maine on July 28, 2023**

15. On July 28, 2023, at approximately 2206 hours, Biddeford Communications received a "911" emergency call from a male at 34 South Street whispering "Help" repeatedly. Dispatch was also able to hear males screaming "get down, get down, you think I'm fucking playing, you think this is a game." The dispatcher could hear screaming as well as a male issuing threats to "show me your phone." The line then disconnected. Biddeford Patrol officers, as well as Biddeford Rescue Personnel were dispatched to the scene.

16. Upon arrival, Corporal Andrew Shortill approached 34 South Street via the Jefferson Street side. Cpl. Shortill was able to walk onto an exterior porch and was able to see through a window on the first floor to the first-floor apartment of 34 South Street. Cpl. Shortill observed a tall, stocky, black male within the first-floor apartment who appeared to have an individual(s) at gun point. Cpl. Shortill could see that the black male was holding a black in color semi-automatic handgun with a silver/chrome barrel.

---

[2] I recently asked CS-2 to attempt to contact Lyttle over TT2. The call disconnected soon after it was answered.

17. As Cpl. Shortill was making the above observations, other members of the Biddeford Police Department Patrol Division responded to the area and begun creating a perimeter around the building of 34 South Street.

18. Shortly thereafter, a male and female hastily exited and/or were pushed from the main entrance door to 34 South Street. The male and female were later identified. The female had injuries to her head and face.

19. A Biddeford detective learned the following after speaking with the male who came out of 34 South Street:

a. The male and female were at 34 South Street;

b. The apartment renter left the apartment to purchase items at the store;

c. After the occupant left the apartment, a black male known as "Nate;" entered the apartment and became confrontational with the male and female;

d. "Nate" was in possession of a handgun and had brandished the firearm;

e. "Nate" accused the female of stealing money from his residence located at 32 Cutts Street, Biddeford, Maine;

f. "Nate" resides with Lloyd Lyttle;

g. Soon after "Nate" arrived, he struck the female in the head/face area with the handgun approximately four times;

h. "Nate" demanded of them to return the money he believed that the female had stolen from him;

i. "Nate" had also pointed the firearm at the male, to which the male told "Nate," "You better just kill me." The male stated that "Nate" then told the male and female to "get out" of the apartment;

j.  They exited the apartment to South Street where they were contacted by law enforcement.

20. The male and female each reviewed a series of photographs. Both people identified a known photograph of Nathaniel Ashwood as "Nate." The male and the female have also identified Lloyd Lyttle as their nephew.

21. A later review of surveillance footage shows a male consistent in appearance with Nathaniel Ashwood entering 34 South Street prior to the reported assault.

22. Law enforcement officers believe Ashwood was able to escape through a window. Various surveillance cameras in Biddeford show a male consistent in appearance with Ashwood and wearing consistent clothing running towards 5 Cutts Street from the vicinity of 34 South Street.

**Act of Violence at 5 Cutts Street, Biddeford, Maine on July 28, 2023**

23. In the morning of July 29, 2023, Biddeford Police Officers responded to an emergency call for service at 5 Cutts Street in Biddeford. Upon arrival, patrol officers made contact with Person 1. Officers observed that Person 1 had injuries to his face and elsewhere. Person 1 was transported to Maine Medical Center.[3]

24. During the course of the follow-up investigation, law enforcement officers interviewed numerous witnesses to the assault of Person 1.[4] Multiple witnesses reported that Person 1 was assaulted by two males. Witnesses stated that during the assault, Person 1 was sodomized with a broomstick.

---

[3] Person 1 is under indictment in this Court for a drug offense. There is an active warrant for his arrest.
[4] There were several witnesses to the assault. Many were at the location to acquire and/or use narcotics. Witnesses also reported an assault on another person earlier in the evening at 5 Cutts Street.

25.	Multiple witnesses told law enforcement that during the assault, the two perpetrators had a video call with someone who goes by "Face" and showed "Face" what they had done.

26.	As described below, I believe Marcus Matthes is the person known as "Face." Matthes is the subscriber of telephone number (267) 304-7715.

27.	Medical records indicate that Person 1 suffered serious injuries from the assault.

28.	During a subsequent search of 5 Cutts Street, law enforcement recovered a broom with suspected blood on it. A laboratory identified two palm prints on the broom as belonging to Lloyd Lyttle.

29.	Surveillance footage from a store near 5 Cutts Street shows males consistent in appearance with Lloyd Lyttle and Nathaniel Ashwood entering the store together at about 6:42 p.m. on July 28, 2023. On that same day at about 9:16 p.m., surveillance footage showed Ashwood entering the store and purchasing a bottle of Barefoot wine. A similar bottle of Barefoot wine was recovered at 5 Cutts Street.

30.	Surveillance footage also showed males consistent in appearance and wearing clothes consistent with those observed on the convenience store camera (believed to be Lyttle and Ashwood) enter and exit 5 Cutts Street during the night hours of July 28, 2023.

## Interview of Cooperating Defendant 1

31. On August 31, 2023, Cooperating Defendant 1 (CD-1)[5] participated in an interview with law enforcement pursuant to a standard proffer agreement. In summary and in part, CD-1 stated the following:

a. CD-1 stated he was present at 5 Cutts Street on the night Person 1 was assaulted;

b. CD-1 identified others who were also present;

c. CD-1 first observed a beating of Person 2 committed by three people -- Person 1, a male known to CD-1 as "Nate" and a male known to CD-1 as "Nephew;"

d. CD-1 reported that the assailants said that the beating of Person 2 was over a $120 drug debt;

e. CD-1 stated that he/she left 5 Cutts Street but returned about 2-3 hours later to buy more drugs;

f. Upon his/her return, "Nephew" let him/her inside;

g. CD-1 gave $200 to "Nephew" for crack;

h. CD-1 observed Person 2 in the bathtub and in clothes;

i. Once CD-1 was inside, "Nephew" took Person 1's gun and forced everyone in the home to surrender their cellular telephones;

j. CD-1 stated he and others were held inside at gun point for approximately 3-4 hours;

k. While inside the house, "Nephew" and "Nate" assaulted Person 1;

l. During the assault, CD-1 observed "Nephew" and "Nate" place a FaceTime call to "Face;"

---

[5] CD-1 has a prior conviction for drug trafficking for which he/she served a prison sentence. CD-1 is currently facing additional felony drug charges in this Court. He/she is cooperating in hopes of receiving consideration in prosecution and/or sentencing. No promises have been made to CD-1.

m. CD-1 stated he/she knew it was "Face" on the other end of the call because he/she has known "Face" for five to six years and knows his voice;

n. CD-1 has previously purchased crack cocaine from "Face;"

o. During the assault, "Nate" kept telling Person 1 he was stupid for allowing him into his "trap house" (which I know to be a term for a location used to store and sell drugs);

p. CD-1 stated the assault was retaliation for Person 1's involvement in a robbery of another drug dealer who goes by "Face;"

q. CD-1 stated that after the assault, he/she observed "Nephew" and "Nate" steal about an ounce of crack cocaine, about 100 grams of fentanyl, and a Torus .380 firearm from Person 1;

r. After the assault, "Nephew" gave CD-1 a 9mm Beretta firearm;

s. CD-1 returned the firearm to "Nephew" later in the night;

t. CD-1 knows "Nephew" to also go by "Tressi."

32.   I showed CD-1 a series of photographs.  CD-1 stated that the known photograph of Lloyd Lyttle looked like "Tressi" but CD-1 was not 100 percent sure. CD-1 did not identify a known photograph of Nathaniel Ashwood.[6]

**Arrest of Nathaniel Ashwood and Seizure of Narcotics and Firearm**

33.   On August 16, 2023, law enforcement personnel in Springfield, Vermont, responded to a report of loud noises that were possibly fireworks or gunshots. Upon arrival at the scene, an officer observed a Cadillac XT5 bearing Florida registration 6230AN ("the Cadillac") depart the area. Bystanders pointed to

---

[6] I have shown photographic arrays containing known photos of Lyttle and Ashwood to other people who were present at 5 Cutts Street on the night of the assault.  Some witnesses have identified the people in the photos and others have not identified the people in the photos.

the Cadillac and indicated it was involved in the incident. The officer attempted to stop the Cadillac. The Cadillac failed to stop and attempted to flee at a high rate of speed.

34. The officer followed the Cadillac onto Interstate 91 as it accelerated to speeds of approximately 110 miles per hour. The Cadillac ultimately crashed on an exit ramp in Rockingham, Vermont. Two occupants fled on foot. A third occupant was located in the passenger seat with his seatbelt fastened. The passenger confirmed that two other occupants fled. Law enforcement officers noted fecal matter on the driver's seat of the Cadillac.

35. Through use of a drone with thermal imaging capacity, law enforcement located Nathaniel Ashwood and a second male in the woods in the vicinity of the crash. The second male appeared to have defecated on himself. Neither admitted to operating the Cadillac. Ashwood, the other male in the woods, and the male found in the Cadillac were transported to a hospital. While on the way to the hospital, Ashwood stated he was under the influence of PCP.

36. On August 16, 2023, a female called the Springfield (Vermont) Police Department and reported that she found a firearm on Main Street near the area where Main Street becomes Clinton Street. Law enforcement responded and seized a Beretta PX4, 9mm handgun, bearing serial number PZ22059 ("the firearm") and a locked black zippered pouch. The firearm is black in color with a chrome barrel. There was a round in the chamber. Officers noted scrapes and scuffs on the firearm that appeared consistent with the gun skidding across the roadway. Cruiser camera footage from the police car pursuing the Cadillac revealed that items were discarded from the Cadillac in the area where the firearm and black pouch were located.

37. A trace of the firearm's serial number revealed that it was reported stolen in Maine. I am aware that on about April 30, 2023, a male reported to law enforcement that a female stole the firearm from his truck in Scarborough.

38. A search of the black zippered pouch pursuant to a state search warrant resulted in the recovery of bags of suspected narcotics in quantities that I believe based upon my training and experience are consistent with further distribution.

**Controlled Purchase from Marcus Matthes on September 21, 2023**

39. On September 21, 2023, a confidential source (CS-1)[7] working with DEA told agents that she was able to purchase controlled substances from a male who went by "Face." As explained below, I believe "Face" to be a name used by Marcus Matthes.

40. On September 21, 2023, CS-1 placed a recorded phone call to TT1 at the direction of law enforcement officers. During this call, the following exchange occurred:

Matthes: Hello?

CS-1: You here?

Matthes: Yup.

CS-1: Okay. Where do you want me to go?

---

[7] CS-1 has a history of cooperating with a local police department. He/she has no pending federal charges but is facing state felony charges related to a crime of dishonesty. CS-1 has a significant criminal history to include convictions for assault, violation of a protection from harassment order, disorderly conduct, theft for unauthorized taking or transfer, forgery, unlawful possession of scheduled drugs, violating conditions of release, and reckless conduct. No promises have been made to CS-1. CS-1 recently told agents that he/she no longer wishes to provide information to law enforcement. CS-1 also failed to appear pursuant to a grand jury subpoena. A warrant was then issued for CS-1's arrest. CS-1 was arrested pursuant to the warrant and released on bail.

Matthes: Where you at?

CS-1: I am at [REDACTED].

…

Matthes: How much you got?

CS-1: I need a basket. So, what's the… what's the price of the day?

Matthes: Huh?

CS-1: What's the price of the day?

(U/I)

Matthes: You know I'm doing mine for 125 (U/I)

CS-1: That's fine. Just making sure.

Matthes: 250 (U/I)

CS-1: Cut it out. Be nice today

Matthes: 250 a whole slam. Half a slam 125.

CS-1: Just make sure it's straight, okay. Where do you want me to go?

Matthes: Um, go to um, Sullivan.

…

Matthes: 250 and I don't want no surprises. Okay? 'Cause I don't want no surprises.

  41. I believe this call is drug related. Specifically, I believe the following:

a. CS-1 confirmed that Matthes was in Biddeford and available to meet;

b. Matthes asked CS-1 how much money CS-1 had;

c. CS-1 indicated he/she wanted a "basket" – which I know to be code for 3.5 grams of crack cocaine;

d. CS-1 asked about prices;

e. Matthes indicated he sold a "whole" (3.5 grams) for $250 and "half" (1.75 grams) for $125;

f. CS-1 and Matthes agreed to meet on Sullivan Street.

g. Matthes told CS-1 he did not want any surprises in the transaction.

42. Prior to a transaction, agents searched CS-1 for money and contraband with negative results. Agents provided CS-1 with United States currency to make the purchase as well as recording equipment.

43. While under surveillance by agents, CS-1 walked down Sullivan Street. CS-1 did not interact with any other people while walking to the meeting location. Agents then observed CS-1 meet with a male consistent in appearance with Matthes for a brief period.

44. Following the transaction, CS-1 walked back to a pre-determined meeting location while under surveillance by agents. CS-1 did not meet with anyone else while walking to the meeting location. CS-1 relinquished a baggie containing a substance consistent in appearance with cocaine base. CS-1 stated that he/she obtained the substance from "Face."

45. A subsequent field test using a Tru-Narc device was presumptively positive for the presence of cocaine.

46. Following the transaction, Task Force Officer (TFO) Thomas Lapierre reviewed surveillance cameras in place within the City of Biddeford. The male who met with CS-1 was captured on camera shortly after the transaction. This male is consistent in appearance with a known photograph of Matthes. I also note that Matthes is the subscriber of TT1.

47.  CS-1 subsequently allowed agents to review stored electronic messages. I note that on August 9, 2023, CS-1 sent a message to (267) 304-7715 stating "Ur gonna call ur people's to see them." The user of (267) 304-7715 responded, "The broom stick crew." I believe "the broom stick crew" is a reference to the people who assaulted Person 1 on July 28, 2023.

### Review of Phone Records

48.  Toll records show three contacts between TT2 and (267) 304-7715 (the phone subscribed to by Marcus Matthes) at 10:49 pm on July 28, 2023. This is consistent with the contact during the assault of Person 1 as reported by CD-1.

49.  Phone records reveal that TT2 and (267) 304-7715 had approximately 80 contacts between June 2, 2023, and July 28, 2023. TT2 had approximately 63 contacts with a phone believed to be used by Nathaniel Ashwood between June 20, 2023, and July 31, 2023.

50.  Phone records reveal that TT2 has sent or received approximately 1095 phone contacts between September 15, 2023 and October 18, 2023. I note that of the 1095 contacts, many are with people who have a criminal history that include drug offenses:

a. There are 157 contacts with a phone subscribed to by Florance Hanlon. The most recent contact was on October 16, 2023. Hanlon's criminal history report shows two prior drug possession charges, the most recent being March 9, 2023.

b. There are 106 contacts with a phone subscribed to by Jovan Calhoun. The most recent contact was on October 14, 2023. Calhoun's criminal history report shows five prior drug charges to include both trafficking and possession. The most recent charge is listed as August 10, 2023.

c. There are 57 contacts with a phone subscribed to by Kerey Swan. The most recent contact was on October 15, 2023. Swan's criminal history report shows a drug possession charge from October 6, 2022.

d. There are 19 contacts with a phone associated through a public database as belonging to Corey Shepard. The most recent contact was on October 15, 2023. Shepard's criminal history report shows a prior drug possession charge from 2011.

51.   On August 14, 2023, the Biddeford Police Department submitted a preservation request to Verizon Wireless requesting the preservation of text message content between July 27, 2023, and July 29, 2023. On August 25, 2023, the United States Attorney's Office submitted a preservation request to Verizon Wireless requesting the preservation of records from July 25, 2023, to the date of the letter. I believe it is likely that Verizon Wireless no longer retains all of the content that law enforcement sought to preserve.

FURTHER BACKGROUND AND TRAINING AND EXPERIENCE OF AFFIANT

52.   Based on my training and experience, and conversations with other law enforcement agents who have conducted controlled substance distribution investigations, I know the following:

a. Distributors of controlled substances often communicate with their co-conspirators using cellular phones and often use multiple cellular telephones to compartmentalize their operations or to avoid detection by law enforcement;

b. Distributors of controlled substances frequently use these cellular telephones to not only engage in voice communications, but also to send text messages, emails, and digital photographs to their co-conspirators in furtherance of their criminal activity, including both drug trafficking and the laundering of drug proceeds.

16

53. In my training and experience, I have learned that Verizon Wireless provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for Verizon Wireless subscribers may be located on the computers of Verizon Wireless. Further, I am aware that computers located at Verizon Wireless contain information and other stored electronic communications belonging to unrelated third parties.

54. Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of Verizon Wireless for weeks or months.

55. Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging."

56. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and

17

methods of connecting associated with every communication in which a particular cellular device was involved.

57. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

58. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

59. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the

subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifiers for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

60. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

## METHODS TO BE USED TO EXECUTE SEARCH

61. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Verizon Wireless to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Upon receipt of the information described in Section I of Attachment B, government-authorized

persons will review that information to locate the items described in Section II of Attachment B.

62. In this case, because Verizon Wireless personnel will be assisting in the execution of the search warrant and the search will be no more intrusive at night than during the day, I request that the Court find that there is good cause to execute the warrant during either daytime or nighttime. See Fed. R. Crim. P. 41(e)(2)(a)(ii).

## CONCLUSION

63. Based on the above, I believe that 207-240-9812 has been used in furtherance of drug trafficking and violent crimes in aid of racketeering. I believe the search will reveal communications between 207-240-9812 and other drug suppliers and/or customers as well as communications about acts of violence. I submit there is probable cause that the servers of Version Wireless contain text message communications about drug trafficking.

64. Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of Verizon Wireless there exists evidence of a crime. Accordingly, a search warrant is requested.

_____
MICHAEL GAGNON
SPECIAL AGENT
U.S. DRUG ENFORCEMENT ADMINISTRATION

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Oct 20 2023

City and state: Portland, Maine

_____
Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title